## IN THE COURT OF COMMON PLEAS
## CLERMONT COUNTY, OHIO

TOTAL QUALITY LOGISTICS, LLC
4289 Ivy Pointe Boulevard
Cincinnati, OH 45245

      Plaintiff,

v.

JACOB RYAN LANKFORD
7711 Skiron Lane
Baytown, TX 77523

and

POINT FREIGHT SYSTEMS, LLC
2 Town Square Blvd., Suite 370
Asheville, NC 28803

Registered Agent:
Gustavo Kolmel
157 Wilson Rd.
Fairview, NC 28730

     Defendants.

Case No. 2023CVH421

# JUDGE MILES

**VERIFIED COMPLAINT FOR
TEMPORARY RESTRAINING ORDER,
PRELIMINARY INJUNCTION,
PERMANENT INJUNCTION,
AND MONEY DAMAGES**

FILED

BARBARA A. WIEDENBEIN
CLERK OF COMMON PLEAS
CLERMONT COUNTY, OH
2023 MAY -8 PM 12: 01

The Plaintiff, Total Quality Logistics, LLC (hereinafter "TQL"), for its Verified Complaint against Defendants Jacob Ryan Lankford ("Lankford") and Point Freight Systems, LLC ("PFS"), states as follows:

### PARTIES, JURISDICTION, AND VENUE

1.    TQL is an Ohio limited liability company with its principal place of business at 4289 Ivy Pointe Boulevard, Cincinnati, Clermont County, Ohio.

2.    Upon information and belief, Lankford is an individual who resides at 7711 Skiron Lane, Baytown, TX 77523.

1

3.     PFS is a North Carolina limited liability company whose principal place of business is 2 Town Square Blvd., Suite 370, Asheville, North Carolina and whose registered agent is Gustavo Kolmel, 157 Wilson Road, Fairview, North Carolina, 28730.

4.     This Court has subject matter original jurisdiction over this action because it involves claims for breach of contract, misappropriation of trade secrets and tortious interference with contract, and the amount in controversy exceeds the court's jurisdictional minimum.

5.     This Court has personal jurisdiction over the Defendants because they contracted in Ohio, conduct business in Ohio, submitted to the Court's jurisdiction, and/or committed intentional and tortious acts against an Ohio company.

6.     Venue is proper in this Court because Lankford contracted with TQL in Clermont County, Ohio, and agreed to jurisdiction and venue in this Court. Additionally, venue is proper in this Court because PFS committed an intentional and tortious act against TQL in Clermont County, Ohio.

## GENERAL ALLEGATIONS
### TQL's Business

7.     TQL is a national leader in the logistics industry, providing shipping services, third-party logistics services, freight brokerage services, truck brokerage services, and supply-chain management services across the United States.

8.     Among other things, relationships are essential to sustained success within the industry.

9.     Due to the extremely competitive nature of the third-party logistics industry, TQL spends significant time, money, and resources developing its goodwill and its relationships with new customers and motor carriers and strengthening its relationships

2

with existing customers and motor carriers, as well as with suppliers, and others within its industry.

10.     TQL is unique in its industry due to the extensive training it provides from the outset of employment to its employees—who generally have no knowledge of or experience in TQL's industry—on TQL's blueprint for succeeding in the industry and due to the tools it provides its employees, including proprietary software.

11.     The relationships, tools, and training developed by TQL assist its employees in gaining intimate knowledge of TQL's business model, its customers, motor carriers, suppliers, contact information, lanes, pricing, sales strategy, service, and other confidential and proprietary information.

12.     TQL has made substantial investments to develop, protect, and maintain confidential and proprietary information, including but not limited to, its operating policies and procedures; computer databases and software; financial records; customer, motor carrier, and vendor lists, including individual names and contact information for key personnel; trade secrets; pricing, marketing, and sales lists and strategies; and other data, processes, and procedures.

13.     TQL takes multiple measures to protect the confidentiality of its proprietary information and trade secrets, the substantial investments it makes in its employees, and its relationships with its customers, motor carriers, and suppliers.

14.     Among other things, TQL conditions employee access upon use of constantly changing passwords and requires all employees to execute agreements that restrict their ability to compete against TQL, to solicit TQL's customers or employees, and to make unauthorized disclosure, dissemination, and use of such information. Moreover, TQL's

3

systems implement internal controls that prevent employees from downloading, sending, or printing certain information.

### Lankford's Employment at TQL

15.     Lankford worked at TQL from May 18, 2020 to July 1, 2022 in TQL's Denver, Colorado office as a Logistics Account Executive Trainee, Logistics Account Executive, and Logistics Account Executive Saturday Group Leader.

16.     Prior to joining TQL, Lankford had no experience in sales within the logistics industry.

17.     Prior to beginning his employment with TQL, Lankford signed an Employee Non-Compete, Confidentiality and Non-Solicitation Agreement (hereinafter referred to as the "NCA") with TQL. A copy of the NCA is attached hereto as Exhibit A.

18.     The NCA contains several restrictive covenants, including but not limited to that Lankford would not, for a period of one year after his employment with TQL ended, work for, associate with any TQL competitor, solicit any TQL customer or carrier with which TQL had a relationship, or divert business from TQL.

19.     The NCA also provides that, for any time during which Lankford is in violation of the NCA's restrictive covenants, such restrictive covenants are tolled until such violation ceases.

20.     Lankford also agreed in the NCA to keep confidential and not disclose or use any confidential, trade secret, or proprietary information to which he was exposed while working for TQL.

21. Lankford also contractually agreed in the NCA that Ohio law controls the interpretation and enforcement of the NCA and that legal actions arising from the NCA shall be brought in this Court.

22. Further, Lankford expressly agreed that the geographic, duration, and content restrictions in the NCA are reasonable and properly required for the adequate protection of the business of TQL from the disclosure of Confidential Information, including trade secrets, and unfair competition.

23. The NCA also provides that in the event of a breach or threatened breach of any part of the NCA, TQL shall be entitled to an injunction restraining Lankford from such breach or threatened breach and that Lankford shall be liable for costs, expenses, and reasonable attorneys' fees incurred by TQL in enforcing the NCA.

24. During his employment at TQL, Lankford received extensive training (including but not limited to 26 weeks in TQL's intensive training program) on topics that includes its services, pricing structure, sales strategies, customers, carriers, and general operations. In short, he was given the blueprint from an industry leader on how to successfully broker freight.

25. Lankford was also provided access to TQL's confidential and proprietary information, including TQL-compiled customer, prospect, and motor carrier lists containing, among other things, names of key personnel, personal contact information for key personnel, and historical TQL business and financial information.

26. Lankford developed close relationships with and an intimate knowledge of certain TQL customers and carriers and was a primary point of contact with TQL customers with whom he interacted.

5

### Lankford's Violation of the NCA

27.     Lankford's separation from TQL was on July 1, 2022, therefore, assuming no violation, the restrictive covenants in his NCA would not have expired until July 1, 2023.

28.     PFS is a freight brokerage and participant in the logistics industry which holds federal administrative authority to operate as a freight broker.

29.     Lankford is currently employed by PFS and has solicited at least one of TQL's customers with whom he used to work while employed at TQL on behalf of PFS.

30.     In doing so, Lankford has instructed a customer to "Make sure to delete all that TQL stuff," because Lankford "don't need people hitting me up for taking my business back."

31.     PFS knew or should have known that Lankford was subject to restrictive covenants because they are prevalent in the industry.

32.     Despite this knowledge, PFS hired Lankford to compete with TQL.

33.     TQL attempted to communicate with PFS about Lankford's employment and the terms of the NCA in an email sent to PFS's President sent on April 14, 2023.

### COUNT I: BREACH OF CONTRACT (DAMAGES)
### (Asserted against Lankford)

34.     TQL adopts and incorporates by reference the allegations in preceding paragraphs of this Complaint.

35.     After his employment with TQL ended and well before his one-year restrictive covenants had expired, Lankford accepted a position with PFS that is the same as or similar to his position at TQL.

36.     Lankford has solicited at least one TQL customer, and has used and/or disclosed confidential TQL information, and/or has otherwise unfairly competed with TQL.

6

37.     The NCA is a valid and legally enforceable contract that TQL and Lankford entered into freely and without duress.

38.     In exchange for his commitment to be bound by the NCA, Lankford received adequate and sufficient consideration, including, without limitation, ongoing employment, extensive training, and continued access to TQL's confidential information and trade secrets to assist with his professional development.

39.     The NCA is reasonable in scope and is reasonably tailored to protect TQL's legitimate business interests.

40.     As a direct and proximate result of Lankford's breach of the NCA, TQL has suffered past and future damages, including the costs and attorney fees incurred in this action, in an amount to be determined at trial in excess of $25,000.00.

<u>**COUNT II: BREACH OF CONTRACT (INJUNCTIVE RELIEF)**</u>
**(Asserted against Lankford)**

41.     TQL adopts and incorporates by reference the allegations in the preceding paragraphs.

42.     Lankford's breach of the NCA is ongoing, continuing and causing irreparable harm to TQL.

43.     Specifically, Lankford is working in a competitive role for a TQL competitor and is soliciting TQL clients in an effort to divert the customer's business from TQL to PFS.

44.     Lankford's employment with PFS inevitably requires him to use the specialized training and information provided to him by TQL to compete with TQL in violation of the NCA.

45.     Lankford has already demonstrated that he will solicit TQL customers in violation of the NCA.

7

46.     Lankford possesses confidential and proprietary information obtained from TQL by virtue of his promise to abide by the terms of the NCA. His use of such confidential information against TQL amounts to unfair competition for which there is no adequate remedy at law.

47.     Lankford acknowledged in the NCA that the covenants contained therein were reasonable, and that TQL is entitled to injunctive relief for any breach or threatened breach of the NCA.

48.     Unless immediately restrained and enjoined, Lankford will continue to cause such irreparable harm, damage, and injury to TQL.

49.     TQL therefore requests that the Court issue a temporary restraining order, preliminary injunction, and permanent injunction against Lankford enjoining him from any further breach of the NCA.

### COUNT III: MISAPPROPRIATION OF TRADE SECRETS (DAMAGES)
### (Asserted Against Lankford and PFS)

50.     TQL adopts and incorporates by reference the allegations in the preceding paragraphs of this Complaint.

51.     The confidential information provided to Lankford while employed at TQL is a TQL trade secret subject to protection under the Ohio Uniform Trade Secrets Act, R.C. 1333.61, *et seq.*

52.     Lankford acknowledged in the NCA that the confidential information provided to him by TQL constitutes TQL's trade secrets.

53.     This information derives independent economic value by not being readily known or ascertainable through proper means by other persons who can obtain economic value from its disclosure or use—namely, TQL's competitors.

54.    TQL has spent much time over many years and invested significant sums, in terms of both financial and human resources, to develop and maintain this information.

55.    This information is the subject of reasonable efforts by TQL to maintain its secrecy, including conditioning employee access to its system upon use of constantly changing passwords, restricting employees from downloading or printing certain information, and requiring all employees to agree to sign an agreement containing confidentiality and restrictive covenant provisions similar to those included in the NCA.

56.    Upon information and belief, Lankford's conduct constitutes misappropriation under the Ohio Uniform Trade Secrets Act because he has solicited a TQL client and has used, threatened to use, and inevitably will use this information in his employment and/or association with PFS for PFS's benefit.

57.    At the time Lankford misappropriated TQL's trade secrets, he knew that he had acquired those trade secrets by improper means and had clear knowledge that his access to the protected information under circumstances giving rise to a duty to maintain the information's secrecy.

58.    Lankford's conduct was done as an agent of PFS and for PFS's benefit.

59.    As a result of PFS's and Lankford's misappropriation of trade secrets, TQL has suffered and will continue to suffer damages in an amount to be determined at trial in excess of $25,000.00.

### COUNT IV: MISAPPROPRIATION OF TRADE SECRETS (INJUNCTIVE RELIEF)
### (Asserted against Lankford and PFS)

60.    TQL adopts and incorporates by reference the allegations in the foregoing paragraphs of this Complaint.

61.     The actual and/or threatened misappropriation of trade secrets described above, including Defendants' use of TQL's customer information to solicit TQL a customer, is ongoing, continuing, and is causing or threatens to cause irreparable harm to TQL.

62.     Unless immediately restrained and enjoined, Lankford and PFS will continue to cause damage, loss of competitive position, and irreparable harm and injury to TQL for which there is no adequate remedy at law.

63.     TQL therefore requests that the Court issue a temporary restraining order, preliminary injunction, and permanent injunction against the Defendants enjoining them from any misappropriation of TQL's trade secrets.

## COUNT V: TORTIOUS INTERFERENCE WITH CONTRACT (DAMAGES)
### (Asserted against PFS)

64.     TQL adopts and incorporates by reference the allegations in the preceding paragraphs of this Complaint.

65.     Pursuant to the NCA, TQL has a contractual relationship with Lankford.

66.     PFS was aware of the contractual relationships between TQL and Lankford since restrictive covenants are prevalent in the third-party logistics industry.

67.     PFS was put on explicit notice of the contractual relationship between TQL and Lankford via the April 14, 2023 email that TQL sent to PFS.

68.     Despite this knowledge, PFS purposefully and intentionally interfered with this contractual relationship by entering into an employment relationship or other affiliation with Lankford prior to the expiration of his restrictive covenants in the NCA. Such interference continues despite PFS's knowledge that Lankford's ongoing employment or affiliation with PFS violates the NCA.

69. As such, PFS has tortiously, willfully, and maliciously interfered with the contractual obligations that Lankford owes to TQL, without any justifiable excuse, and in bad faith.

70. As a direct and proximate result of PFS's actions, TQL has suffered past and future damages in an amount to be determined at trial in excess of $25,000.00.

## COUNT VI: TORTIOUS INTERFERENCE WITH CONTRACT (INJUNCTIVE RELIEF) (Asserted against PFS)

71. TQL adopts and incorporates by reference the allegations in the preceding paragraphs of this Complaint.

72. PFS has tortiously, willfully, and maliciously interfered with the contractual obligations that Lankford owes to TQL, without any justifiable excuse and in bad faith.

73. Unless restrained and enjoined, PFS's acts will cause ongoing irreparable harm, damage, and injury to TQL for which there is no adequate remedy at law.

74. Therefore, TQL requests that the Court issue a preliminary and permanent injunction against PFS prohibiting it from employing or associating with Lankford in violation of the restrictive covenants he owes to TQL.

### PRAYER FOR RELIEF

**WHEREFORE,** TQL respectfully requests that this Court issue a judgment as follows:

(a) Issue immediate temporary, preliminary, and permanent injunctive relief prohibiting Lankford from any further violation of the NCA

(b) Issue immediate, temporary, preliminary, and permanent injunctive relief prohibiting Lankford and PFS from misappropriating or threatening to misappropriate TQL's trade secrets;

(c) Issue immediate, temporary, preliminary, and permanent injunctive relief prohibiting PFS from further tortiously interfering with TQL's contractual relations with Lankford;

(d)  Award compensatory damages, punitive damages, and reasonable attorney fees in favor of TQL in an amount to be determined at trial in excess of $25,000.00;

(e)  Award punitive damages in favor of TQL in an amount to be determined at trial;

(f)  Award attorney fees as provided in the NCAs or as otherwise provided by law;

(g)  Award court costs and expense, prejudgment interest, and post-judgment interest; and

(h)  Any other relief that this Court deems just and proper.

Respectfully submitted,

_____
Jeffrey C. Mando, Esq. (#43548)
Daniel E. Linneman, Esq. (#77902)
ADAMS LAW, PLLC
40 West Pike Street
Covington, KY 41011
859.394.6200
859.392.7263 – Fax
jmando@adamsattorneys.com
dlinneman@adamsattorneys.com

*Attorneys for Plaintiff, Total Quality Logistics, LLC*

## VERIFICATION OF COMPLAINT

I, Marc Bostwick, the Risk Manager of Total Quality Logistics, LLC ("TQL"), verify that I am the duly authorized representative of TQL, that I am personally aware of the facts related to this matter or the facts have otherwise been made known to me, and that the factual allegations in the verified complaint are true and correct to the best of my knowledge, information, and belief.

_____

MARC BOSTWICK

STATE OF OHIO )

): 

COUNTY OF CLERMONT )

Subscribed and sworn by MARC BOSTWICK before me, a Notary Public, on this 5th day of May, 2023.

_____

NOTARY PUBLIC

My Commission Expires: _____

ID#: _____

KELLY A. PIERRO
Notary Public, State of Ohio
My Commission Expires
July 22, 2023

14

## TOTAL QUALITY LOGISTICS, LLC

### Employee Non-Compete, Confidentiality and Non-Solicitation Agreement

### (Colorado)

This Employee Non-Compete, Confidentiality and Non-Solicitation Agreement ("Agreement") is entered into by and between Total Quality Logistics, LLC ("TQL"), 4289 Ivy Pointe Blvd., Cincinnati, Ohio 45245, and the Employee whose name is set forth below his or her signature on the last page of this Agreement and whose address is on file with TQL ("Employee"). Performance under this Agreement will begin on the date Employee's employment with TQL actively begins.

### RECITALS:

**WHEREAS**, TQL is an Ohio limited liability company providing shipping services, third-party logistics services, freight brokerage services, truck brokerage services, and supply-chain management services throughout the Continental United States. References to TQL in this Agreement refer to TQL, its parent and subsidiary companies, all related entities, and its successors and assigns;

**WHEREAS**, TQL is unique within the organizations providing shipping services, third-party logistics services, freight brokerage services, truck brokerage services, and supply-chain management services (the "Industry"). TQL has spent extensive time developing its goodwill and its relationships with Customers, Motor Carriers, suppliers, and others within the Industry. TQL provides extensive and unique training on ways to succeed within the Industry. TQL also provides tools, such as proprietary software, that are unique within the Industry. The relationships, tools, and training developed by TQL are unique and specific and will assist Employee in gaining intimate knowledge of TQL's business model, its Customers, Motor Carriers, suppliers, contact information, lanes, pricing, sales strategy, service, and other confidential and proprietary information. The knowledge learned at TQL is unlike what could be learned elsewhere within the Industry. TQL takes steps to protect the confidentiality of this information and it has value to a TQL competitor. Employee, therefore, acknowledges and agrees that what Employee learns and is trained in at TQL will include trade secrets of TQL and would necessarily cause unfair competition if Employee took employment competitive to TQL;

**WHEREAS**, TQL develops and maintains confidential proprietary trade secret information (hereinafter referred to as, "Confidential Information"), including but not limited to, its operating policies and procedures; computer databases; computer software; methods of computer software development and utilization; computer source codes; financial records, including but not limited to, credit history and information about Customers and potential Customers, Motor Carriers, and suppliers; information about transactions, pricing, the manner and mode of doing business, and the terms of business dealings and relationships with Customers and Motor Carriers; financial and operating controls and procedures; contracts and agreements of all kinds, including those with Customers, Motor Carriers, and vendors; pricing, marketing, and sales lists and strategies; Customer lists and Motor Carrier lists including contact names, physical and email addresses, telephone numbers, and other information about them; trade secrets; correspondence; accounts; business policies; purchasing information; functions and records; logistics management; data, processes, and procedures; and unique training program provided

CO                                                            1

to its employees. Confidential Information also includes any information described above which TQL obtains from another company and which TQL treats as proprietary or designates as Confidential Information, whether or not owned or developed by TQL. This information may be in tangible written form, computer databases, or it may be represented and communicated solely by oral expressions or business activities which are not reduced to written form. Confidential Information may be protected by patents, copyrights, or other means of protection. Confidential Information does not include information that is protected by the National Labor Relations Act ("NLRA"), and nothing in this Agreement shall be interpreted to prohibit employees from engaging in protected activity under the NLRA, including without limitation discussing wages, hours, or terms and conditions of employment. TQL will not prohibit or discipline any of its employees from or for discussing their wages, hours, or other terms and conditions of employment or engaging in any other activity protected by the NLRA;

**WHEREAS**, Employee agrees that any and all such Confidential Information set forth above, whether or not formally designated as such, is vital to the success of TQL's business and Employee understands that all such Confidential Information is the exclusive property of TQL, that it is to be treated and maintained as confidential proprietary information by Employee, and that it is treated and maintained as confidential proprietary information by TQL;

**WHEREAS**, in order to allow TQL to remain effective and competitive in the marketplace in which it conducts its business, and to maintain its business relationships on the basis of trust and confidence, it is essential that all Confidential Information remain protected from unauthorized disclosure, dissemination, and use, except as authorized and required by TQL to enable Employee to properly perform his or her work in the normal course of TQL's business;

**WHEREAS**, Employee acknowledges that unauthorized use or disclosure of Confidential Information as defined herein would cause, or be likely to cause, substantial and irreparable harm and detriment to TQL and would constitute unreasonable and unfair competition to TQL;

**WHEREAS**, Employee acknowledges that TQL's Customer and Motor Carrier lists, other information about TQL's Customers and Motor Carriers, its Load Management System, and other Confidential Information, are proprietary trade secrets with significant economic value, are compiled through a substantial investment of time and money by TQL, and are not common knowledge throughout the Industry;

**WHEREAS**, in the course and scope of employment by TQL, Employee must be given access to such Confidential Information from time-to-time or continuously, in order to effectively perform his or her job duties;

**WHEREAS**, Employee desires to be employed by TQL and TQL will not agree to employ or continue to employ Employee, unless Employee signs this Agreement and agrees to be bound by it; and

**WHEREAS**, this Agreement is being executed by the parties at the commencement of the Employee's employment with TQL.

**NOW THEREFORE**, in consideration of the employment or continued employment of Employee by TQL, including compensation and benefits provided by TQL, and the terms, conditions, and

CO                                          2

covenants, set forth herein, which Employee considers adequate consideration for the promises contained herein, TQL and Employee agree as follows:

1.     Recitals. The "Recitals" set forth above are hereby restated and incorporated herein by reference as though fully set forth again.

2.     Employee Duties. Employee shall undertake and assume the responsibility of performing for and on behalf of TQL whatever duties shall be assigned to Employee by TQL at any time and from time-to-time. It is further understood that TQL retains the right to modify Employee's duties at any time and, in its discretion, determine Employee's compensation, including but not limited to, any salary, other cash compensation, and benefits.

3.     At-will Employment. Employee is an employee at-will. Nothing in this Agreement changes Employee's status as an at-will employee. Either TQL or Employee may terminate Employee's employment for any reason at any time.

4.     TQL Owns Confidential Information. All Confidential Information as described herein is proprietary and the sole property of TQL.

5.     Confidential Information Is for TQL's Use Only. Unless Employee has prior written consent from TQL, Employee shall not at any time during the course of his or her employment by TQL, and at all times thereafter, use for any purpose or publish, copy, disclose, or communicate to any individual, firm, corporation, or other business entity other than TQL, any Confidential Information, except as properly necessary and authorized by TQL in the conduct of TQL's business or as required by law. Employee agrees that all information related to TQL's business and disclosed to Employee or to which Employee has access during the period of his or her employment shall be presumed to be Confidential Information hereunder if there is any reasonable basis to believe it to be Confidential Information or if TQL appears to treat it as confidential.

6.     Return of Company Property. Upon termination of employment or upon request by TQL for any reason, Employee will immediately deliver to TQL all originals and all copies of all documents and other materials obtained from or belonging to TQL, including but not limited to all Confidential Information, regardless of form, in Employee's possession, custody, or control, including but not limited to any TQL files, documents (including any containing customer information), computer data, or other media however stored, and Employee will retain no copy of any such document, data, or other materials.

7.     Presumption Regarding Confidential Information. Employee agrees that, during the time limits of the covenants identified in Section 9(b), Employee's engaging in any form of employment relationship with a Competing Business, as defined in Section 9 below, will be presumed to necessarily result in Employee revealing, basing judgments and decisions upon, or otherwise using TQL's Confidential Information to unfairly compete with TQL.

8.     Property Rights and Assignment. Employee agrees that any work, invention, product design, or technological innovation created, conceived, developed, produced, generated, and/or improved by Employee, whether or not patentable, or subject to copyright, trademark, or trade secret protection, at any time during or arising out of Employee's employment with TQL that results from, is suggested by, or relates to any work which Employee does for TQL, shall be the

CO                                                    3

absolute property of TQL and shall promptly be disclosed by Employee to TQL. Employee hereby assigns any and all right, title, and interest in any work product to TQL, including assigning any and all rights to any future invention arising out of or relating to Employee's employment with TQL. To the extent necessary, during employment and thereafter, Employee shall sign applications, assignments, and any other papers that TQL may consider necessary or helpful in perfecting and enforcing TQL's rights in, and to, any such invention, improvement, and/or technological innovation.

9.    Covenants and Remedies.

    (a)    Agreement to Covenants and Material Breach. The Employee hereby covenants and agrees to the terms and conditions of the restrictive covenants and agreements set forth in Sections 4 through 9 of this Agreement, and agrees that any breach thereof shall constitute a material breach by the Employee of his or her obligations under this Agreement.

    (b)    Covenants. Employee agrees that, during the course of his or her employment (except as required in the course of Employee's employment with TQL), and for a period of one (1) year after termination or cessation of Employee's employment for any reason:

        (i) Employee will not, directly or indirectly, own, operate, maintain, consult with, be employed by (including self-employment), engage in, or have any other interest (whether as an owner, shareholder, officer, director, partner, member, employee, joint venture, beneficiary, independent contractor, agent, or any other interest) in any Competing Business (as defined below), except the ownership of less than 1% of the outstanding equity securities of any publicly-held corporation or entity;[1]

        (ii)    Employee will not directly or indirectly, either as an employee, agent, consultant, contractor, officer, owner, or in any other capacity or manner whatsoever, whether or not for compensation, participate in any transportation-intermediary business that provides services anywhere in the Continental United States, including but not limited to any person or organization that provides shipping, third-party logistics, freight brokerage, truck brokerage, or supply-chain management services;[2]

        (iii)    Employee will not, directly or indirectly, solicit any Customer, Motor Carrier, client, consultant, supplier, vendor, lessee, or lessor, or take any action, to divert business from TQL;[3]

---

[1]For employees in Colorado who start employment on or after August 10, 2022, should a court rule that Colorado law applies to this provision, the restriction in Section 9(b)(i) shall be void, *ab initio*, and of no legal force or effect, if, at the time Employee enters this Agreement or at the time of its enforcement, Employee's annualized cash compensation does not meet the necessary compensation threshold required for enforcement under Colorado law.

[2]For employees in Colorado who start employment on or after August 10, 2022, should a court rule that Colorado law applies to this provision, the restriction in Section 9(b)(ii) shall be void, *ab initio*, and of no legal force or effect, if, at the time Employee enters this Agreement or at the time of its enforcement, Employee's annualized cash compensation does not meet the necessary compensation threshold required for enforcement under Colorado law.

[3] For employees in Colorado who start employment on or after August 10, 2022, should a court rule that Colorado law applies to this provision, the restriction in Section 9(b)(iii) shall be void, *ab initio*, and of no legal force or effect,

CO                                          4

(iv) Employee will not, directly or indirectly, interfere with, tamper with, disrupt, use, or attempt to disrupt any contractual or other relationship, or prospective relationship, between TQL and any Customer, Motor Carrier, client, consultant, supplier, vendor, lessee, or lessor of TQL; and

(v) Employee will not, directly or indirectly employ, recruit, solicit, or assist others in employing, recruiting, or soliciting any person who is, or within the previous twelve (12) months has been, an employee of, consultant with, or been party to another business relationship with TQL.

(vi) It is further understood and agreed that the running of the one (1) year set forth in this Paragraph shall be tolled during any time period during which Employee violates any provision of this Agreement.

(c)     Trade Secrets.  The Employee recognizes and acknowledges that TQL's trade secrets, Customer lists, Motor Carrier lists, Load Management System, private processes, and other Confidential Information as they may exist from time to time are valuable, special, and unique assets of TQL's business, access to and knowledge of which are essential to performance of Employee's duties hereunder.  Employee will not at any time hereafter disclose such trade secrets, Customer lists, Motor Carrier lists, Load Management System, private processes, and other Confidential Information to any person, firm, corporation, association, or other entity for any reason or purpose whatsoever, except as required by law, nor shall Employee make use of any such property for Employee's own purpose or the benefit of any person, firm, corporation, association, or any entity other than TQL under any circumstance.  Employee recognizes and acknowledges that TQL has a near permanent relationship with its Customers and but for Employee's association with TQL, Employee would not have such contact with Customers.

(d)     Reasonableness of Restrictions.  Employee recognizes that the foregoing geographic, duration, and content restrictions are reasonable and properly required for the adequate protection of the business of TQL from the disclosure of Confidential Information, including Trade Secrets, and unfair competition.  Employee recognizes the geographic scope applicable to this Agreement -- the Continental United States -- is reasonable based on the understanding of the parties that TQL operates throughout the Continental United States as of the date of this Agreement and Employee will represent TQL's interests with Customers and potential customers throughout the Continental United States on a regular basis.

(e)     Injunction.  If there is a breach or threatened breach of any part of this Agreement, TQL shall be entitled to an injunction restraining Employee from such breach or threatened breach.  Alternatively and additionally, TQL, in its sole discretion, may pursue a claim for damages in tort and/or contract resulting from any breach or threatened breach of this Agreement by Employee.  If Employee is found by a court of competent jurisdiction to have violated the terms of this Agreement, Employee shall be liable for costs, expenses, and reasonable attorneys' fees incurred by TQL.

---

if, at the time Employee enters this Agreement or at the time of its enforcement, Employee's annualized cash compensation does not meet the necessary compensation threshold required for enforcement under Colorado law.

(f) For purposes of this Agreement, the term: (i) "Customer" is any individual, business, or other entity, for whom TQL has rendered any service, or with respect to which TQL has planned and/or made contact for the purpose of rendering any service, within the twenty-four (24) months immediately preceding the termination or cessation of Employee's employment; (ii) "Motor Carrier" is any over-the-road shipper, carrier, trucker, or hauling business that has transported freight for any TQL Customer as a result of a relationship, dealings, arrangements, or communications with TQL, or with respect to which TQL has planned and/or made contact for this purpose, within the twenty-four (24) months immediately preceding the termination or cessation of Employee's employment; (iii) "Competing Business" is any person, firm, corporation, or entity that is engaged in shipping, third-party logistics, freight brokerage, truck brokerage, or supply-chain management services anywhere in the Continental United States; and (iv) "solicit" includes, but is not limited to, any efforts in any form intended to take business away from, intercept, or interfere with the business of TQL, including relationships with TQL and its employees, Customers, Motor Carriers, clients, consultants, suppliers, vendors, lessees, lessors, and employees, and specifically, including doing business with any Customer or Motor Carrier.

(g) Pursuant to the Defense of Trade Secrets Act, 18 U.S.C. § 1833(b), an individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that is made (1) in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney; and solely for the purpose of reporting or investigating a suspected violation of law; or (2) in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. An individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the individual files any document containing the trade secret under seal and does not disclose the trade secret, except pursuant to the court order.

10. Governing Law, Jurisdiction, and Venue. This Agreement shall be interpreted and enforced under the laws of the State of Ohio, without giving effect to conflict of law provisions which would result in the application of any law other than Ohio law. Any action, suit, or proceeding with respect to or arising out of this Agreement shall be brought in the Court of Common Pleas, Clermont County, Ohio, the United States District Court for the Southern District of Ohio, the District Court for the City and County of Denver, Colorado, or the United States District Court for the District of Colorado. Further, Employee hereby submits to the personal jurisdiction of the state and/or federal courts identified in this Section, consents to service of process therefrom, and waives any other requirements with respect to personal jurisdiction, venue, or service of process.

11. Severability. Should any of the provisions of this Agreement be declared or determined to be illegal or invalid, (a) the validity of the remaining parts, terms, or provisions shall not be affected thereby and said illegal or invalid part, term, or provision shall be deemed not a part of this Agreement; (b) the remaining provisions of this Agreement shall remain in full force and effect and shall not be affected by such illegal, invalid, or unenforceable provision or by its severance from this Agreement; and (c) there shall be added automatically as a part of this Agreement a provision as similar in terms to such illegal, invalid, or unenforceable provision as may be possible and still be legal, valid, and enforceable.

CO                                          6

12.     Personnel Policies. Employee agrees to abide by TQL's rules, regulations, policies, and practices, written and to the extent that Employee has actual knowledge thereof, unwritten, as they may from time to time be adopted or modified by TQL at its sole discretion. TQL's written rules, policies, practices, and procedures shall be binding on Employee unless superseded by or in conflict with this Agreement, in which case this Agreement shall govern. However, such rules, policies, practices, and procedures are not part of this Agreement and whether written, oral or implied, shall not create any contract between Employee and TQL at any time. Additional contractual obligations or other modifications of this Agreement may be made only by an express written agreement between Employee and TQL.

13.     No Conflicting Employee Agreement. Employee represents that Employee is not bound by any agreement or contract or other duty to a former employer or any other party which would prevent Employee from complying with any obligations hereunder or performing his or her duties as an employee of TQL.

14.     Acknowledgments. Employee acknowledges and agrees that he or she:

   (a) has had sufficient time within which to consider this Agreement before executing it;
   (b) has carefully read and fully understands all of the provisions of this Agreement;
   (c) knowingly and voluntarily agrees to all of the terms set forth in this Agreement;
   (d) knowingly and voluntarily intends to be legally bound by this Agreement;
   (e) has had sufficient opportunity to obtain and consult with his or her own lawyer regarding this Agreement; and
   (f) has knowingly and voluntarily executed this Agreement.

15.     Binding Agreement. This Agreement shall be binding and enforceable upon the parties hereto, their heirs, representatives, successors, and assigns. This Agreement is not assignable by Employee, but is fully assignable by TQL without notice or consent from the Employee.

16.     Entire Agreement. This Agreement sets forth the entire agreement between the parties hereto pertaining to the subject of this Agreement, and fully supersedes in all respects any and all prior oral or written agreements or understandings between the parties hereto pertaining to the subject of this Agreement, including, but not limited to, the prior non-compete. This Agreement may be amended or modified only upon a written agreement signed by both of the parties hereto. This Agreement may be executed in counterparts, each of which shall be deemed an original and all of which taken together shall constitute one Agreement.

CO                                        7

**IN WITNESS WHEREOF**, the parties agree that this Agreement may be signed by electronic means, and by their electronic endorsement through TQL's system or their physical signature below, the parties intend to sign this Agreement and acknowledge that they have read this Agreement in its entirety; understand the terms of this Agreement; have had the opportunity to consult with legal counsel regarding the terms of this Agreement; and knowingly, voluntarily, and willfully enter into this Agreement without any duress or coercion of any kind.

**EMPLOYEE:**                                    **TOTAL QUALITY LOGISTICS, LLC**

| | | | | | | |
|---|---|---|---|---|---|---|
| Non-Compete - Colorado ... | 12/24/2019 | Non-Compete (Colorado 12-15-19).pdf | e-signature | Jacob Lankford (Terminated) (31809) | 06/18/2020 11:39:49 AM | By selecting the "I Agree" button below, I acknowledge that I have received this document, read it in its entirety, understand the terms, conditions and requirements the document places on me; have had the opportunity to consult with legal counsel regarding the terms of the document; and knowingly, voluntarily, and willfully agree to comply with the terms of the document. |
| Non-Compete - Colorado | 12/24/2019 | Non-Compete (Colorado 12-15-19).pdf | e-signature | Chris Brown (03776) | 05/18/2020 11:42:11 AM | By selecting the "I Agree" button below, I acknowledge that I have received this document, read it in its entirety; understand the terms, conditions and requirements the document places on me; have had the opportunity to consult with legal counsel regarding the terms of the document; and knowingly, voluntarily, and willfully agree to comply with the terms of the document. |

CO                                    8